UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

RALPH GAMBLES, individually and as a representative
of the classes,

                              Plaintiff,

              -v-

STERLING INFOSYSTEMS, INC.,

                          Defendant.

------------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**_____
**DATE FILED:** _2-13-17_

15 Civ. 9746 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Ralph Gambles brings this putative class action under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"). He claims that defendant Sterling Infosystems, Inc. ("Sterling") violated his privacy rights under FCRA when, for use by a prospective employer to whom Gambles had applied for a job as a mortgage banker, it generated a background report containing false, misleading, and outdated information about the addresses at which Gambles had lived. Gambles claims that the report violated FCRA in that it (1) contained information about addresses where he had not lived in more seven years; (2) incorrectly, inconsistently, or duplicatively reported the dates that Gambles had lived at various addresses; and (3) used false and derogatory terms to describe certain addresses. Gambles claims these statements depicted him as itinerant, unstable, and unattractive. He brings claims under the FCRA for (1) reporting outdated adverse information in violation of 15 U.S.C. § 1681c(a), (2) duplicative reporting, and (3) reporting of inaccurate information, the latter two in violation of 15 U.S.C. § 1681e(b), which requires a consumer reporting agency to use reasonable procedures to assure the maximum

possible accuracy of consumer reports.  He seeks statutory and punitive damages as well as attorneys' fees.

Sterling now moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  It argues that the facts alleged in the Second Amended Complaint ("SAC") do not make out a concrete and particularized injury-in-fact sufficient to give Gambles standing to sue under Article III of the Constitution.  Sterling principally argues that even if its Report about Gambles violated the FCRA, there was no injury to Gambles, because the SAC does not allege that Gambles's prospective employer relied on these challenged aspects of the Report when it declined to offer him a job, or that the report otherwise harmed his job prospects.

For the following reasons, the Court denies Sterling's motion to dismiss.

## I.     Background[1]

The claims in the SAC arise from Sterling's having created a background report about Gambles and furnished it to Gambles's potential employer.  Gambles alleges that the report contained outdated, duplicative, misleading, and adverse information about him.

### A.     Gambles's Factual Allegations About Sterling's Report

The Court focuses here on the allegations relevant to whether Gambles suffered a legally cognizable injury.  On Sterling's motion to dismiss, the Court treats these allegations as true.

In January 2014, Gambles applied to work as a mortgage banker, a position which paid an annual salary of less than $75,000.  SAC ¶ 22.

---

[1] The following summary of Gambles's factual allegations is drawn from the SAC, filed June 22, 2016.  Dkt. 47.  The SAC attached various exhibits, including, as Exhibit 2, the background report (the "Report") about Gambles at issue here.  SAC, Ex. 2.

On or about January 29, 2014, Sterling furnished the Report to Gambles's prospective employer. *Id.* ¶ 23. The Report was created and furnished to the employer solely in connection with Gambles's job application. It did not arise from any investigation of suspected misconduct on Gambles's part, whether in employment or elsewhere. *Id.* ¶ 24.

The Report purports to set out addresses where Gambles had lived, each accompanied by a "first seen" and "last seen" date. *Id.* ¶¶ 25–27. The Report contains 53 total address entries for Gambles but only 19 unique addresses. *Id.* ¶ 29. For various addresses, the duplicative entries contain overlapping and contradictory "first seen" and "last seen" dates. *Id.* ¶¶ 27–29. The first "first seen" date in the Report is June 2000; the last "last seen" date is December 2013. *Id.* ¶ 30.

As to eight addresses, the notation "HIGH RISK INDICATOR" appears alongside the address, which is then followed by a short description of the address. *Id.* ¶¶ 31–32. The descriptions are, variously, "nursing and personal care facility," "rooming or boarding house," and "hotel or motel." *Id.*; Report at 3–6. Three of these eight notations relate to addresses as to which Gambles's reported dates of residence predate the report by more than seven years. SAC ¶ 33.

The SAC claims that the Report's account of Gambles's addresses, in various respects, is inaccurate. *See id.* ¶ 36. The inaccuracies include addresses at which Gambles, in fact, never resided; incorrect dates for when Gambles lived at various addresses; and notations alongside addresses labeled as "HIGH RISK INDICATOR" addresses that incorrectly describe these variously as a "hotel or motel," a "rooming or boarding house," or a "nursing and personal care facility," when in fact those addresses were simply residential apartments. *Id.*

The SAC alleges that Sterling knew its customers would rely on the address information in the reports for employment purposes and intended that its customers do so. The SAC alleges,

in fact, that Sterling's customers certified that they were using the addresses in the reports for employment purposes. *Id.* ¶ 69.

The SAC alleges that Sterling failed to use reasonable procedures in creating the Report. Sterling generates background reports by using algorithms that collect information from various electronic databases. *Id.* ¶¶ 46–47. The SAC alleges that, given Sterling's ability to generate these reports, it could have created an algorithm that would exclude addresses at which he lived more than seven years ago, *id.* ¶¶ 46–51, or resolve duplicative, incoherent, or overlapping "first seen" and "last seen" dates, *id.* ¶¶ 56–60, 65. The SAC further alleges that Sterling did not manually review background reports before issuing them. *Id.* ¶¶ 52, 65. The SAC acknowledges that the Report includes a disclaimer that the information in it, "for legal and practical reasons," should be used only to verify information provided by the job application of the Report's subject, and "should not be used alone or in conjunction with any other information to make an employment decision." *Id.* ¶ 67; Report at 7.

The SAC alleges that the Report's errors harmed Gambles by making him less appealing to prospective employers, casting him as itinerant and unstable, and that it infringed his privacy interests. *Id.* ¶¶ 37–41. The Report, the SAC alleges, also caused Gambles emotional harm. *Id.* ¶ 43. The SAC further alleges that, because Sterling is a large employment screening company, there is a risk that it will report information in the Report to another potential employer. *Id.* ¶ 42. The SAC does not, however, allege that the employer to whom the Report was furnished based its decision not to hire Gambles on its account of his address history.

The SAC brings three FCRA claims, each on behalf of a putative class defined by the type of information that Sterling allegedly improperly disseminated in its reports. The first, on behalf of a "Outdated Adverse Information Class," brings a claim under 15 U.S.C. § 1681c(a) on

behalf of persons whose background report contained addresses for time periods that predated the report by more than seven years, one of which has a "high risk indicator."  The second, on behalf of a "Duplicative Information Class," brings a claim under 15 U.S.C. § 1681e(b) on behalf of persons whose background report contained multiple references to the same address. The third, on behalf of a "Inaccurate Address Information Sub-Class," brings a claim under 15 U.S.C. § 1681e(b) on behalf of persons in the Duplicative Information Class as to whom there are inconsistent "first seen" and "last seen" dates for a particular address.  *See id.* ¶ 78.

### B.    Procedural History

On December 14, 2015, Gambles filed a Complaint.  Dkt. 1.  On March 28, 2016, Sterling filed a motion to dismiss.  Dkt. 21.  On April 8, 2016, Gambles filed a First Amended Complaint ("FAC").  Dkt. 28.  On April 15, 2016, the Court stayed proceedings pending the decision in *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), Dkt. 34, which was decided on May 16, 2016.  On May 31, 2016, Sterling moved to dismiss the FAC.  Dkt. 39.  On June 22, 2016, Gambles filed the SAC, Dkt. 47, having been granted leave to do so on June 20, 2016, Dkt. 44. On July 25, 2016, Sterling filed the instant motion to dismiss, Dkt. 51, and included a memorandum of law in support, Dkt. 52 ("Sterling Mem.").  On August 8, 2016, Gambles filed an opposition to Sterling's motion.  Dkt. 53 ("Gambles Opp.").  On August 15, 2016, Sterling filed a reply in support of its motion.  Dkt. 56 ("Sterling Rep.").

On September 15, 2016, the Court held argument on Sterling's motion to dismiss, and commissioned supplemental briefing.  *See* Dkt. 62 ("Tr.").  On September 29, 2016, Gambles and Sterling filed supplemental briefs, Dkts. 60, 61 ("Sterling Supp."), respectively.  During the briefing process, the parties have filed letters drawing the Court's attention to supplemental case authority.  *See* Dkts. 55, 59, 68–71.

## II.    Discussion

Sterling moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that Gambles does not have standing to bring his lawsuit because the SAC does not plead a cognizable injury-in-fact.

### A.    Applicable Legal Principles Governing Standing

Article III standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). A justiciable case or controversy is required for a federal court to have subject matter jurisdiction over a case, and standing is "perhaps the most important" doctrine of justiciability. *Allen v. Wright*, 468 U.S. 737, 750–51 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). "If [a] plaintiff[] lack[s] Article III standing, a court has no subject matter jurisdiction to hear [his or her] claim," requiring that the case be dismissed. *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quotation omitted); *see also Cortlandt Street Recovery Corp. v. Hallas Telecommns. S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015). A plaintiff must "demonstrate standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).

In considering a motion to dismiss for lack of subject matter jurisdiction, such as for a lack of standing, under Rule 12(b)(1), a court must accept as true the material factual allegations contained in the complaint, but a court is "not to draw inferences from the complaint favorable to plaintiffs." *See J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004); *see also APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) ("Jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable

6

to the party asserting it." (citation omitted)).  "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Accordingly, in resolving a motion to dismiss for lack of standing, "general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, but "a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing," *Baur*, 352 F.3d at 637.  A court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [a court] may not rely on conclusory or hearsay statements contained in the affidavits." *Attica Central Schools*, 386 F.3d at 110.  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *McGowan v. United States*, 825 F.3d 118, 125–26 (2d Cir. 2016) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).

To establish Article III standing, a plaintiff must establish the following three elements as an "irreducible constitutional minimum": (1) injury-in-fact, meaning "an actual or imminent" and "concrete and particularized" harm to a "legally protected interest"; (2) causation of the injury, meaning that the injury is "fairly traceable" to the challenged action of the defendant; and (3) redressability, meaning that it must be "likely," not speculative, that a favorable decision by a court will redress the injury.  *Lujan*, 504 U.S. at 560–61 (citations and quotations omitted); *accord Cacchillo*, 638 F.3d at 404.  Because Sterling's challenge to Gambles's standing to bring

this suit focuses on the first element, the existence of a cognizable injury-in-fact, the Court

focuses here on standards governing that element.[2]

For an injury to be "concrete," the injury "must be '*de facto*'; that is, it must actually

exist." *Spokeo*, 136 S. Ct. at 1548 (citing Black's Law Dictionary 479 (9th ed. 2009)).

"Concrete" means an injury falling within the "usual meaning of the term—'real,' and not

'abstract.'" *Id.* (citations omitted).  In determining whether a plaintiff's alleged injury is

concrete, the Court "need not credit a complaint's conclusory statements without reference to its

factual context." *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146 (2d Cir. 2011)

(internal quotation marks and citation omitted); *see also Baur*, 352 F.3d at 637.

A claimed injury, however, need not be "tangible" to be concrete.  Although tangible

injuries like monetary loss "are perhaps easier to recognize," *Spokeo*, 136 S. Ct. at 1549, in a

variety of contexts, intangible injuries have been held sufficiently concrete to be cognizable.

These include infringements on First Amendment rights,[3] aesthetic harm caused by violations of

environmental laws to visitors of affected areas,[4] the denial of statutorily required information

---

[2] The Supreme Court has separately developed "prudential" limits on standing to sue.  These
limit a plaintiff's ability to sue to vindicate another's legal rights ("third-party standing"), to raise
"generalized grievances" more properly addressed through the political process, and to bring
claims outside the "zone of interests" addressed by the statute in question.  *See Allen*, 468 U.S. at
751; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88
(2014) ("Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to
determine, using traditional tools of statutory interpretation, whether a legislatively conferred
cause of action encompasses a particular plaintiff's claim." (internal quotation marks and
citations omitted)).  Sterling's motion does not implicate considerations of prudential standing.

[3] *See, e.g.*, *id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (infringement on
free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (infringement
on free exercise of religion)).

[4] *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183
(2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use
the affected area and are persons for whom the aesthetic and recreational values of the area will

regarding housing,[5] the allocation of Social Security benefits so as to give benefits to recipients other than the plaintiff,[6] denial of the benefit of living in an integrated community to a tenant as a result of allegedly unlawful race discrimination in housing against housing applicants,[7] and the denial of information secured to voters by statute.[8]

For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.   A plaintiff therefore may not rely on the fact that he or she has styled his case as a class action, because this "adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth*, 422 U.S. at 502)).   Put differently, although a plaintiff "has standing to seek

---

be lessened by the challenged activity" (quotation omitted)); *see also Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." (citation omitted)).

[5] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982) (plaintiff, who did not intend to rent or purchase a residence, suffered injury-in-fact when she was denied "truthful information concerning the availability of housing," as secured by the Fair Housing Act).

[6] *Heckler v. Mathews*, 465 U.S. 728, 738–40 (1984) (male retiree, a member of a class excluded from certain Social Security benefits, had standing to sue for violation of Equal Protection Clause, even though the statute at issue provided that, in the event of its invalidation on constitutional grounds, the relevant benefits would be withdrawn from the favored class and not extended to the excluded class).

[7] *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 208–12 (1972) (injury-in-fact suffered by tenants of housing complex as a result of denial of benefits of living in an integrated community due to racial discrimination against housing applicants).

[8] *Federal Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998) (voters who claimed "inability to obtain information" required to be made public by the Federal Election Campaign Act adequately alleged injury-in-fact).

redress for injuries done to him, [he or she] may not seek redress for injuries done to others."
*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972).

Because injury-in-fact relates to Article III standing, whether a given injury is sufficiently concrete and particularized is a judicial inquiry, not a legislative determination. *See Spokeo*, 136 S. Ct. at 1547–48 ("Injury in fact is a constitutional requirement, and 'it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)). To be sure, a statute's definition or extension of rights may have the effect of "elevat[ing] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law[.]" *Lujan*, 504 U.S. at 578. In the end, though, as the Supreme Court has recognized, while congressional determinations are important in the injury-in-fact analysis, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549. "Article III standing requires a concrete injury even in the context of a statutory violation."[9] *Id.*

Finally, to satisfy Article III, the asserted injury must also be actual or imminent. This requires a plaintiff to allege a non-speculative injury; allegations of merely "conjectural or

---

[9] As the Supreme Court has explained, "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* A court is to consider, *inter alia*, "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* At the same time, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Id.* The Court applies *infra* these standards to the injuries Gambles asserts.

hypothetical" harm do not suffice.  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted); *see also United States v. Probber*, 170 F.3d 345, 349 (2d Cir. 1999) (plaintiff lacked standing when "injuries [were] too speculative to satisfy the case-or-controversy requirement of Article III").

### B.      The FCRA

The FCRA was enacted in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681).  The statute reflects congressional findings that "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system. . . .  There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a); *see also United States v. Bormes*, 133 S. Ct. 12, 15 (2012) (FCRA "has as one of its purposes to 'protect consumer privacy.'") (citation omitted)).  The statute recites as its purpose "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of [the FCRA]."  15 U.S.C. § 1681(b).

Towards that end, the FCRA imposes various requirements on credit reporting agencies, to which the FCRA refers as "consumer reporting agencies."  The FCRA defines a "consumer report," as a communication "of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation,

personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes." 15 U.S.C. § 1681a(d)(1). It regulates the content that may be included in such a report, providing that such the agency's report may not contain certain enumerated "items of information." For example, as to the person who is the subject of the report, the report may not contain information about bankruptcy cases that predate the report by more than 10 years; records of arrest that predate the report by more than seven years; or paid tax liens paid more than seven years before the report. *Id.* § 1681c(a). Relevant here, the report also prohibits "[a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years." *Id.* § 1861c(a)(5). But these restrictions do not apply in certain circumstances, including when the report is to be used in connection with a person's employment and the annual salary of the prospective employment "equals, or [] may reasonably be expected to equal $75,000 or more. *Id.* § 1681c(b). [10]

The FCRA also requires that consumer reporting agencies "maintain reasonable procedures designed to avoid violations of section 1681c," which "shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." *Id.* § 1681e(a). The FCRA further requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Id.* § 1681e(b).

---

[10] That exception does not apply here, as Gambles pleads that the position in connection with which the Report was used stood to pay him less than $75,000. SAC ¶ 22.

The FCRA provides penalties for willful noncompliance, as alleged here.  *See* 15 U.S.C. § 1681n.[11]  A plaintiff may recover actual damages or statutory damages between $100 and $1,000 per violation, punitive damages, and attorneys' fees and costs.  15 U.S.C. § 1681n(a); *see also Northrop v. Hoffman of Simsbury, Inc.*, 12 F. App'x 44, 50 (2d Cir. 2001) ("[a]ctual damages are not a statutory prerequisite to punitive damages" under FCRA).

## C.    Analysis

The SAC alleges that Sterling's Report violated FCRA in multiple respects in its account of Gambles's past addresses: by inaccurately reporting the number (53) of these addresses, by wrongly reporting addresses where Gambles had never resided, by giving incorrect dates when Gambles lived at various addresses, by reporting addresses outside the FCRA's seven-year limit, and by falsely labeling eight of Gambles's residences as "high risk" establishments based on inaccurate descriptions of them—"nursing and personal care facility," "rooming or boarding house," or "hotel or motel."  On Sterling's motion to dismiss for lack of standing, the sole issue is whether, based on these allegations, Gambles suffered a concrete and particularized injury-in-fact.[12]

As to that issue, the parties focus on the Supreme Court's recent decision in *Spokeo*, handed down between the filing of the FAC and the SAC.  Sterling argues that *Spokeo* marked a "change in the law," establishing, it claims, that the reporting of inaccurate information does not

---

[11] The FCRA also provides remedies—actual damages and attorneys' fees and costs—for negligent violations.  15 U.S.C. § 1681o.  Here, however, the SAC alleges that Sterling's violations of the FCRA in connection with the Report were willful.  SAC ¶¶ 75–77, 90, 99, 107.

[12] The other elements of Article III standing are not in dispute:  If Gambles suffered an injury-in-fact as a result of these disclosures, it was clearly traceable to Sterling's creation of the Report and redressable via the FCRA's damages remedies.  Sterling does not argue otherwise, or that the SAC fails principles of prudential standing.

establish an injury-in-fact.   Sterling Rep. at 1–2.  As support, Sterling points to the statement in *Spokeo* that "not all inaccuracies cause harm or present any material risk of harm," *Spokeo*, 136 S. Ct. at 1550.  Gambles counters that *Spokeo* did not change standing, but rather, reaffirmed the relevant doctrine, including that both tangible and intangible injuries can be concrete.  Gambles Opp. at 7–8 (citing *Spokeo*, 136 S. Ct. at 1549 ("we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete")).

Gambles's depiction of *Spokeo* as reaffirming, rather than substantively altering, existing standing principles is the more correct.  *Spokeo* was brought under FCRA provisions including § 1681b(b) and § 1681e(b), by a plaintiff, Robins, who alleged that consumer reporting agency Spokeo had generated a background profile about him on its website that contained inaccurate information.  As alleged, the profile, which was not used by a potential employer, stated that Robins "is married, has children, is in his 50's, has a job, is relatively affluent, and holds a graduate degree," all of which information, Robins alleged, was false.  *Id.* at 1546.  The District Court dismissed for lack of standing, but the Ninth Circuit reversed and reinstated the case.  The Supreme Court remanded.  The Supreme Court agreed with the Circuit's analysis that Robins had alleged a particularized injury, but held that the Circuit had failed to separately consider whether Robins's alleged injury was concrete.  *Id.* at 1550.  As such, the Circuit's "standing analysis was incomplete."  *Id.*  In remanding for consideration of that issue, the Supreme Court stated that it "take[s] no position as to whether the Ninth Circuit's ultimate conclusion—that Robins adequately alleged an injury in fact—was correct."  *Id.*  The Supreme Court noted that allegations of a "bare procedural violation" do not, without more, confer standing, because "not all inaccuracies cause harm."  *Id.*  To illustrate, the Supreme Court stated that it would be

14

difficult to imagine how dissemination of an "incorrect zip code, without more," could cause concrete harm. *Id.*

Sterling argues that the SAC alleges equivalently harmless procedural violations. It focuses on the fact that the SAC does not allege that the aspects of the Report which Gambles claims violated FCRA—all relating to his addresses—cost Gambles the job as a mortgage banker that he sought. Indeed, Sterling notes that the Report elsewhere, and lawfully, disclosed two criminal cases pending against Gambles, each for aggravated assault with a deadly weapon. Report at 8–9. Sterling posits that the Report's disclosure of these criminal charges, as opposed to its treatment of his past addresses, caused the employer not to hire Gambles, Sterling Br. 11–12, and the SAC does not plead otherwise. Sterling thus argues that the Report's account of Gambles's address history, even if in violation of the FCRA, did not harm Gambles. Such a "bare statutory violation" of FCRA, Sterling argues, does not qualify as an injury-in-fact, any more than would an incorrect zip code. Sterling Br. at 6–7 (citing *Spokeo*, 136 S. Ct. at 1550).

Sterling is surely correct that, had the SAC plausibly pled that the Report's treatment of his past addresses cost Gambles the job he sought, the SAC would have pled a classic injury-in-fact. But Sterling's premise that a Report that recites adverse information about a subject in violation of the FCRA is actionable only where it causes a familiar tangible injury, such as to the subject's finances or job prospects or emotional injury,[13] is not correct. On the contrary, the case

_____

[13] The SAC, in fact, alleges, in a single sentence, that Gambles "was distressed and suffered emotional harm due to the false and derogatory information contained in his report." SAC ¶ 43. But the parties dispute whether this allegation suffices, or is too conclusory, to plead emotional injury adequately. And the SAC does not pursue actual, as opposed to statutory, damages on Gambles's behalf, as might be expected in the case of a well-pleaded emotional injury. *See id.* ¶ 110 (prayer for relief, seeking statutory and punitive damages, reasonable attorneys' fees and costs, and further relief "as this Court may deem appropriate and just"). The Court's finding here of a well-pleaded injury-in-fact does not rely on Gambles's allegation of suffering emotional distress, *see id.* ¶ 43.

law, including *Spokeo* itself in the context of the FCRA, has long underscored that "intangible injuries can nevertheless be concrete."  *See Spokeo*, 136 S. Ct. at 1549 (citations omitted).[14]  As the Supreme Court in *Spokeo* explained, the inquiry into whether an intangible injury is concrete as opposed to a "bare procedural violation" is guided by two considerations:  First, "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," *id.*; and, second, what Congress's judgment was (as reflected in the statute) as to the injuries it sought to elevate to the status of legally cognizable injuries.  *Id.*

Applied here, both factors favor sustaining the SAC.

First, there is a significant history, including at common law, of lawsuits based on (1) the unauthorized disclosure of a person's private information, and (2) the disclosure of adverse information claimed to have been misleading or false.  As to the former, the Supreme Court has described private information as information not freely available to the public or is intended for or restricted to particular people.  *See United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989).  And, it has noted, the "common law and literal understandings of privacy encompass" protection of a person's private information.  *Id.*; *see also* Restatement (Second) of Torts § 652A (1977) ("general principle" is that "one who invades the

---

[14] The Supreme Court emphasized that this principle is well-established.  *See id.* (Supreme Court has "confirmed in many of our previous cases that intangible injuries can nevertheless be concrete").  Lower-court cases have read *Spokeo* to reiterate, not rework, principles of standing. *See Strubel v. Comenity Bank*, 842 F.3d 181, 189–90 (2d Cir. 2016) ("We do not understanding *Spokeo* categorically to have precluded violations of statutorily mandated procedures from qualifying as concrete injuries supporting standing."); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 273 (3d Cir. 2016) ([t]he Supreme Court's recent decision in *Spokeo* . . . does not alter" prior standing analysis); *Burke v. Fed. Nat'l Mortg. Ass'n*, 3:16cv153-HEH, 2016 WL 4249496, at *1 (E.D. Va. Aug. 9, 2016) ("In *Spokeo* . . . the [Supreme] Court reiterated the basic [tenets] of the standing doctrine.").

right of privacy of another is subject to liability for the resulting harm to the interests of the other").  As to the latter, the common law provided for *per se* liability—without proof of special harm—for slanderous statements that would adversely affect one's business, trade, or profession. Restatement (Second) of Torts § 573 (1977) (slanderous imputations affecting business, trade, profession or office); *see also id.* cmt. c. ("Statements concerning merchants that question their solvency or honesty in business come within the rule state in this section, as do statements charging any other quality that would have a direct tendency to alienate custom."); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 570 (S.D.N.Y. 2014) (statement must be made with reference to a matter of significance and importance and be incompatible with the proper conduct of the business, trade or profession) (collecting cases).  Indeed, "it has long been the case that an unauthorized dissemination of one's personal information, even without a showing of actual damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 636 (E.D. Va. 2016) (citing Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890)).

The harms alleged in the SAC have a close relationship to—indeed, they echo—the harms that these two lines of lawsuits have long permitted aggrieved parties to pursue.  With respect to privacy, the SAC brings claims that the Report disclosed information that the FCRA defined as private, such as addresses at which the subject lived more than seven years earlier. With respect to falsity, the SAC alleges that the Report falsely described the nature of a number of Gambles's prior addresses as hotels, motels, rooming houses, and nursing and personal care facilities, for example, and falsely termed eight of these "high risk" residences.  And, the SAC claims, the Report inaccurately presented Gambles as having lived in 53 different addresses over a 13-year period, nearly three times the number of addresses (19) at which Gambles had actually

17

lived.  The effect, the SAC claims, was to falsely portray Gambles as shiftless, unstable and itinerant, and thus ill fit for business employment.  These echo the sorts of allegations on which tort claims were permitted to proceed at common law, whether based on the disclosure of private information or theories of slander or defamation.[15]

Second, as to Congress's intentions, in enacting the FCRA provisions at issue, § 1681c(a) and § 1681e(b), Congress clearly indicated an intention to identify and permit relief at law for the harms that Gambles challenges.  Congress enacted the FCRA "to ensure fair and accurate credit reporting . . . and protect consumer privacy."  *Safeco Ins. Co. of Am.*, 551 U.S. at 52.   The FCRA prohibits the creation of background reports with "adverse" information more than seven years old.  15 U.S.C. § 1681c(5).  It further requires credit agencies to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  *Id.* § 1681e(b).  To vindicate these protections, the FCRA provides for various forms of relief.  These include actual and statutory damages.  *Id.* § 1681n(a). The provision for actual damages reveals that Congress understood that violations of the FCRA may generate demonstrable injuries, such as loss of an actual or potential job.  The provision for statutory damages, in turn, reveals that Congress acknowledged that in some cases, damages from a reporting agency's violation of a subject's FCRA rights might be difficult or impossible to quantify or prove.  *See Thomas*, 193 F. Supp. 3d at 637.

---

[15] Gambles does not bring common law claims.  The Court has no occasion to consider whether such a claim could lie.  The foregoing discussion is intended only to address whether the intangible harms on which the FCRA claims here are based have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Spokeo*, 136 S. Ct. at 1549.  A plaintiff need not allege an injury actually recognized at common law because Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law[.]"  *Lujan*, 504 U.S. at 578.

In light of the common law precursors for Gambles's claims of harm and of Congress's determination that FCRA violations of the sort alleged here merit redress including through statutory damages, the injuries that the SAC alleges are sufficiently concrete to constitute an injury-in-fact. *See Hawkins v. S2Verify*, No. C 15-03502 WHA, 2016 WL 3999458, at *5–6 (N.D. Cal. July 26, 2016) (plaintiff suffered concrete injury sufficient to sue under 15 U.S.C. § 1681c(a) and § 1681e(b) when defendant created background report including arrests of plaintiff more than seven years old, because defendant "published plaintiff's stale arrests . . . [and] thereby sent restricted information about plaintiff into the world and as such caused injury to plaintiff's privacy interest"); *see also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, --- F.3d. ---, No. 15-2309, 2017 WL 242554, at *10–11 (3d Cir. Jan. 20, 2017) (plaintiffs had standing to sue under FCRA when laptops containing their personal information were stolen from defendants, as this "unauthorized dissemination of their own private information—the very injury that FCRA is intended to prevent" constituted "a *de facto* injury that satisfies the concreteness requirement" regardless of "whether or not the disclosure of that information increased the risk of identity theft or some other future harm").

Moreover, while Sterling casts the violations here as "bare procedural violation[s]," the Supreme Court's analysis in *Spokeo* pointedly contrasted non-cognizable procedural violations of the FCRA with FCRA violations in the form of "inaccuracies [that] cause harm *or present any material risk of harm.*" *Spokeo*, 136 S. Ct. 1550 (emphasis added).[16]  The violations that

---

[16] As the Court further noted in *Spokeo*, a plaintiff alleging a statutory violation that constitutes a concrete harm need not allege more than the harm identified by Congress. *Spokeo*, 136 S. Ct. at 1549.  Thus, while Congress may not bestow standing to sue based on a bare procedural violation that does not alone harm a concrete interest of the plaintiff, *see, e.g., Lujan*, 504 U.S. at 571–72 (plaintiffs lacked concrete injury and thereby standing to sue under Endangered Species Act's "citizen-suit" provision, even though provision authorized "any person" to commence a civil suit to challenge violations of act); *Allen*, 468 U.S. at 754 ("an asserted right to have the

Gambles alleges easily clear the latter prong of that alternative standard.  The SAC alleges that

the statements in Sterling's Report about Gambles's address history together cast him as

itinerant, shiftless, and risky, thereby undermining his prospects for employment.  Being

identified falsely as having lived in multiple "high risk" establishments such as rooming or

boarding houses is a far cry from being attributed an incorrect zip code.  Although the Report's

statements do not appear in fact have cost Gambles the job for which he applied, these adverse

statements, as pleaded, certainly presented "a material risk of harm" to him.  *Spokeo,* 136 S. Ct.

at 1550; *see also Strubel*, 842 F.3d at 189–90 (procedural violation gives rise to concrete injury

when "Congress conferred the procedural right to protect a plaintiff's concrete interests" and

violation of it "presents a 'real risk of harm' to that concrete interest" (quoting *Spokeo*, 136 S. Ct.

at 1549)).[17]

   This holding aligns with other cases holding that the dissemination of information about a

plaintiff in violation of a statute aimed at securing privacy or consumer protection results in

---

Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on
a federal court"), to cause an injury-in-fact, the violation of a statutorily required procedure need
do no more than harm a concrete interest of the plaintiff.  The plaintiff, in other words, "need not
allege any *additional* harm beyond the one Congress has identified."  *Spokeo*, 136 S. Ct. at 1549 (emphasis in original).

[17] To the extent that Sterling suggests that Gambles did not have standing to challenge Sterling's
creation of the Report because it did not cost him employment, that argument is defeated not
only by the test reiterated in *Spokeo* ("harm" or "material risk of harm") but also by the case's
outcome.  Like Gambles, the *Spokeo* plaintiff did not allege that the report about him had been
used by a prospective employer.  *See Robins v. Spokeo, Inc.*, 742 F.3d 409, 410–11 (9th Cir.
2014), *vacated and remanded by Spokeo*, 136 S. Ct. at 1550.  The Supreme Court nevertheless
remanded the case for consideration whether the inaccurate information in the report constituted
a concrete harm.  *See Spokeo*, 136 S. Ct. at 1550.  Had an employer's adverse action been
necessary to give rise to a concrete harm, such a remand would have been superfluous.  *See
Strubel*, 842 F.3d at 189 ("[w]e do not understand *Spokeo* categorically to have precluded
violations of statutorily mandated procedures from qualifying as concrete injuries supporting
standing.  Indeed, if that had been the Court's ruling, it would not have remanded the case for
further consideration of whether the particular procedural violations alleged" were concrete).

concrete injury conferring standing to sue.  *See, e.g.*, *American Farm Bureau Fed'n v. United States Envtl. Prot. Agency*, 836 F.3d 963, 966, 968–69 (8th Cir. 2016) (members of farm association had standing to sue when EPA released without consent certain farmers' names, mailing addresses, email addresses, and primary telephone numbers in response to a Freedom Of Information Act request, because "the nonconsensual dissemination of personal information" "is sufficient to establish a concrete and particularized injury in fact" even though the information was otherwise publicly available); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 273–74 (plaintiffs had standing to sue to vindicate concrete injury under the Video Privacy Protection Act, specifically, "the unlawful disclosure of legally protected information," as "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private"); *Thomas*, 193 F. Supp. 3d at 636 (plaintiff had standing to sue under FCRA when defendants obtained his consumer report without first providing required disclosures or obtaining his written consent, as such conduct "invaded the statutory right to confidentiality of his personal information," the disclosure of which "constitutes an invasion of the statutory right to privacy and a concrete injury sufficient to confer Article III standing"); *Burke*, 2016 WL 4249496, at *3–4 (plaintiff had standing to sue under FCRA when defendant allegedly unlawfully obtained her credit report under false pretenses; as "FCRA was meant to protect the interest of privacy[,] . . . [p]laintiff's alleged violation of privacy is a concrete harm, even if that harm does not lead to other, more tangible harms"), *vacated on other grounds by* 2016 WL 7451624 (E.D. Va. Dec. 6, 2016); *cf. Syed v. M-I, LLC*, ---F.3d ---, No. 14-17186, 2017 WL 242559, at * 3–4 (9th Cir. Jan. 20, 2017) (alleged failure by employer to disclose to job applicant its intent to obtain applicant's credit report "in a

document that consists *solely* of the disclosure," as required by 15 U.S.C. § 1681b(b)(2)(A)(i), caused concrete injury supporting standing to sue).

Sterling, finally, argues that the FCRA provisions at issue, 15 U.S.C. § 1681c and § 1681e(b), were concerned not with privacy but instead with the improper use of information. It argues that because the information disclosed about Gambles was not used adversely to him, he has not suffered a concrete injury of the sort at which those provisions aimed to prevent. Sterling Supp. at 4–8. But Sterling's attempt thus to parse the statute is unpersuasive. A court's duty is to review a statute as a whole, not isolated provisions, *see King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)), and the FCRA itself announces that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy," 15 U.S.C. § 1681(a). The provisions that Gambles claims were violated here, while surely also aimed at the FCRA's other goals, also protect the subject's privacy interests.

Accordingly, the Court holds the SAC alleges harms that are sufficiently concrete to constitute injury-in-fact conferring standing to sue.[18]

## CONCLUSION

For the foregoing reasons, the Court denies Sterling's motion to dismiss for want of subject matter jurisdiction. The parties are directed to confer, and jointly to submit a proposed

---

[18] Although suggesting that the SAC also fails the particularity requirement of injury-in-fact, Sterling does not seriously pursue that argument. Nor could he. The particularity requirement requires that the injury alleged be individualized and "not undifferentiated" and affect the plaintiff "in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quotations omitted). Those standards are met here, as the information that the Report allegedly unlawfully disclosed was specific to Gambles and his unique address history.

case management plan by February 27, 2017.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 21, 39, and 51.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 13, 2017
      New York, New York