## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RALPH GAMBLES, THOMAS MERCK and
ELSIE COMPO, individually and as
representatives of the Classes,

                                Plaintiffs,

-v-

STERLING INFOSYSTEMS, INC.,

                              Defendant.

Case No.: 1:15-cv-09746

**FIRST CONSOLIDATED
CLASS ACTION
COMPLAINT**
**(JURY TRIAL DEMANDED)**

        Ralph Gambles, Thomas Merck and Elsie Compo ("Plaintiffs"), on behalf of themselves, the Classes set forth below, and in the public interest, bring this First Consolidated Class Action Complaint against Sterling Infosystems, Inc. ("Defendant").

### PRELIMINARY STATEMENT

        1.      Recognizing that the content of consumer reports can have a significant impact on people's lives, Congress has chosen to regulate the procurement, use, and content of those reports through the Fair Credit Reporting Act ("FCRA").  15 U.S.C. § 1681, *et seq.*

        2.      Plaintiffs seek to hold Defendant accountable for its willful and systemic violations of the FCRA.  This is not the first time Defendant has been sued for including misleading and damaging content in consumer reports.  In 2015 Defendant settled a class action lawsuit over substantially similar conduct as alleged by Plaintiffs, agreeing to pay money damages and to stop violating the law.  Plaintiffs' experiences with Defendant reveal that its illegal conduct has continued to this day.

        3.      Defendant has willfully violated the FCRA by systematically reporting adverse information on consumers which antedates the report by more than seven years, violating 15

1

U.S.C. § 1681c(a), which explicitly prohibits reporting such information.

4.      Specifically, Defendant reports certain consumer address information as a "high risk indicator" because Defendant claims that certain consumer addresses are associated with one or more of the following: hotels, motels, rooming houses, boarding houses, or personal care facilities.  Defendant labels consumers as having this "high risk indicator" even when, according to Defendant's own reports, the consumer has not been "seen" at the address triggering that indicator for many years.

5.      Defendant also fails to maintain reasonable procedures to ensure the addresses it labels as "high risk" housing are the kind of buildings Defendant's reports indicate them to be.  In fact, many of the buildings Defendant labels as "high risk" are just regular apartment buildings. Moreover, even in instances where the type of the building is accurately identified, it is misleading to label a consumer as "high risk" based on nothing more than the fact that the consumer was purportedly "seen" at such a building. There is nothing inherently "high risk" about the buildings Defendant labels as such.

6.      Moreover, Defendant's reports include multiple duplicative entries for the same address, making it appear as though consumers are itinerant.  For example, Defendant's report indicated Plaintiff Gambles has lived at fifty-three different locations, when in reality, the report only includes nineteen unique addresses.  The dates Defendant includes, which purport to be the dates Plaintiff Gambles was "first" and "last" seen at these various addresses, contradict one another and are internally inconsistent, with different "first" and "last" dates appearing for the same address.

7.      By labeling job applicants as "high risk" based on unconfirmed information about the kinds of places they supposedly lived more than seven years ago (in Plaintiff Merck's case, an

address where he lived *twenty-five* years ago, *when he was still a child*), Defendant has taken away the protection the FCRA affords consumers against being judged based on old, and frequently inaccurate, information.  For Plaintiff Compo and other victims of domestic violence who list a shelter as their address on job applications so they can keep their actual residence unknown to an abusive partner, using a "high risk" label makes it more difficult for victims of domestic violence to obtain employment.

8.      Defendant's actions are all the more egregious because Defendant *knows* that including old, adverse, and inaccurate information in its reports violates the law.  Defendant was sued in a separate class action lawsuit in 2012 for reporting outdated adverse information, and the final settlement in that case resulted in Defendant paying over $4 million to resolve those claims against it.  *Ernst v. DISH Network, LLC*, No. 12-cv-8794, ECF No. 237 (S.D.N.Y. November 13, 2015).

9.      Yet, rather than producing accurate reports which only contain lawfully reportable information, Defendant continues to prefer to produce cheap, inaccurate, and outdated reports which create the false appearance of being comprehensive and insightful.

10.     Through this pattern and practice of related violations, Defendant has illegally undermined Congress's carefully struck balance, consistently placing its business interests above the rights of consumers.

11.     Based on Defendant's conduct, Plaintiffs assert FCRA claims on behalf of themselves and three Classes of consumers.  On behalf of themselves and the Classes, Plaintiffs seek statutory damages, punitive damages, attorneys' fees, expenses, costs, and all available other appropriate relief.

## THE PARTIES

12.     Individual and representative Plaintiff Ralph Gambles is a resident of Birmingham, Alabama.

13.     Individual and representative Plaintiff Thomas Merck is a resident of Coshocton, Ohio.

14.     Individual and representative Plaintiff Elsie Compo is a resident of Centennial, Colorado.

15.     Defendant Sterling Infosystems, Inc. is a corporation doing business throughout the United States, including in Manhattan, New York.  Defendant is headquartered in New York, New York.

16.     According to its website, Defendant is a multinational provider of background check products that maintains "20 offices in nine countries, [a] team of more than 3,500 employees [and] proudly serves over 50,000 customers around the world, including a quarter of the Fortune 100."  *See* About Us,  http://www.sterlingtalentsolutions.com/About/About-Us (site last visited April 4, 2017) (attached hereto as Exhibit 1).

17.     Defendant is a consumer reporting agency within the meaning of the FCRA because for monetary fees, it engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such reports.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiffs' claims pursuant to 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in the District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## STATUTORY BACKGROUND

20.     The FCRA was enacted based on Congress's findings that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that there is a "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.  Thus, the FCRA requires consumer reporting agencies to operate "in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *Id.*  The Colorado Consumer Credit Reporting Act, Colo. Rev. Stat. § 12-14.3-101, *et seq.* ("CCRA"), was enacted for a similar purpose and contains similar provisions.

21.     To ensure that consumer reporting agencies report information in a manner which is "fair and equitable to the consumer," and "with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information," the FCRA prohibits consumer reporting agencies from reporting old information.  Specifically, agencies are forbidden from reporting the following:

> (5)  Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.

15 U.S.C. § 1681c(a).

22.     The FCRA also requires that consumer reporting agencies maintain reasonable procedures to ensure "maximum possible accuracy" of the information included in the reports they produce.  *See* 15 U.S.C. § 1681e(b).  The CCRA contains a parallel provision.  Colo. Rev. Stat. § 12-14.3-103.5.

23.     Defendant systematically and purposefully disregards its "grave responsibilities" by routinely reporting outdated, adverse, and inaccurate "high risk" address information on consumers in violation of the FCRA.

## ALLEGATIONS RELATING TO NAMED PLAINTIFF GAMBLES

24.     In January of 2014, Plaintiff Gambles applied for work as a mortgage banker.  The yearly salary for the position for which Plaintiff Gambles applied was under $75,000.

25.     On or around January 29, 2014, Defendant furnished a background report on Plaintiff Gambles to his prospective employer.  A redacted copy of the report is attached hereto as Exhibit 2.

26.     Plaintiff Gambles' report and the reports of other class members were not procured in connection with any investigation of suspected misconduct relating to employment, or compliance with federal, state, or local laws and regulations, the rules of a self-regulatory organization, or any suspected violation of preexisting written policies of the employer.

27.     The report Defendant furnished to Plaintiff Gambles' prospective employer purported to contain information regarding various places Plaintiff Gambles had lived.  This information was presented under the heading "Social Security Trace for County Searches."

28.     The "Social Security Trace for County Searches" section of Plaintiff Gambles' report included no fewer than fifty separate entries, each of which purported to identify an address where Plaintiff Gambles had lived.

29.     Each address entry contains a date which is identified as the "first seen" date and one which is identified as the "last seen" date.  These dates are meant to correspond with the period during which the consumer lived at the address.

30.     Many of these addresses included on Plaintiff Gambles' report are duplicative of one another, and some of the time periods associated with different addresses overlap with one another.

31.     Despite the fact that Defendant's report contains 53 total address entries, it only contains 19 unique addresses.  Moreover, the "first" and "last" seen dates for a number of these addresses contradict one another, meaning that some of the entries are, by definition, inaccurate. (*See, e.g.*, Ex. 2 at 4, listing two identical addresses, one entry showing a "first seen" date of 4/2012 and the second entry for the same address showing a "first seen" date of 5/2011.)

32.     The earliest "first seen" address date included in Plaintiff Gambles' report is August 2000.  The latest "last seen" date is December 2013.

33.     Several of the addresses included in Plaintiff Gambles' report bear a warning statement about Plaintiff Gambles.  Specifically, these addresses state that they are a "high risk indicator."  The phrase "high risk indicator" is then followed by some sort of description purporting to describe the nature of the property located at the "high risk" address.  On Plaintiff Gambles' report, the following kinds of facilities are all labeled as "high risk indicators;" hotels, motels, rooming houses, boarding houses, or personal care facilities.

34.    In total, the phrase "high risk indicator" appears eight times on Plaintiff Gambles' report.

35.    Of the eight instances in which Defendant labeled Plaintiff Gambles as "high risk," three pertain solely to an address where Plaintiff Gambles is identified as having been "first seen" in July 2005, and as having been "last seen" in October 2005.  The entirety of this period antedates the date of the report by more than seven years.

36.    Accordingly, Defendant's report on Plaintiff Gambles unlawfully includes three items of information which are adverse to him, and which pertain to a period that antedates the report by more than seven years.  The inclusion of this information in Plaintiff Gambles' report violates the plain language of 15 U.S.C. § 1681c.

37.    Defendant's report is also inaccurate on its face, as there cannot be multiple dates on which Plaintiff Gambles was "first seen" or "last seen" at a given address.

38.    Defendant's report is also inaccurate with respect to the address history in a myriad of additional ways, a non-exclusive list of  which is below:

a)    On page three of the report (using the pages number on the bottom right of the page), seven entries appear for addresses in Birmingham, Alabama: four on "Avenue S" and three on "Avenue F," with different and overlapping "first seen" and "last seen" dates.  In fact, Plaintiff lived only in one location in Birmingham (on Avenue S), for three years.

b)    On page four, the report lists an address on Liberty Walk Drive in Round Rock, Texas three times, each time with "first seen" and "last seen" dates in 2013.  In fact, Plaintiff lived at that address on one occasion in 2010.

c)     Also on page four, the report contains three separate entries for an address on East Central Texas Expressway, in Killeen, Texas.  Each entry contains the notation: "HIGH RISK INDICATOR: HOTEL OR MOTEL."  Plaintiff lived at that address for one single six-month period, and it was an apartment, not a hotel or motel.

d)     Pages four and five also contain eight separate entries for an address on Ranch Road in Austin, Texas.  Plaintiff only lived at that address for one period of time.

e)     Page four contains six separate entries for an address on Trimier Ave in Killeen, Texas.  Plaintiff only lived at that address for one period of time.

f)     Page five contains three entries for an address on Rainbow Parke Drive in Round Rock, Texas, with dates listed in 2009, 2010 and 2011.  Plaintiff only lived at that address for one continuous period of time, from 2009 to 2010.

g)     Pages five and six contain four separate entries for an address on Scofield Ridge Parkway in Austin, Texas.  Each entry includes the notation "HIGH RISK INDICATOR: ROOMING OR BOARDING HOUSE."  Plaintiff only lived at that address for one period of time, and it was an apartment, not a rooming or boarding house.

h)     Page five contains four separate entries for an address on West Parmer Lane, in Austin, Texas.  Plaintiff only lived at that address for one period of time.

i)     Page five contains three separate entries for an address on Riverside Drive, in Austin, Texas.  Plaintiff only lived at that address for one period of time.

j)     Page six contains four separate entries for an address on Xavier Circle in Minneapolis, Minnesota, with dates ranging from 2000 to 2005.  In fact, Plaintiff lived at that address for one period of time, from 1996 to 2004.

k)      Page six contains four separate entries for an address on 46th Street in Killeen, Texas. Plaintiff never lived at that address.

l)      Page six contains three separate entries for an address in Fort Hood, Texas. Plaintiff lived at that address for one period of time.

m)      Page six contains an entry for an address on Rio Grande Street, in Austin, Texas, with the notation: "HIGH RISK INDICATOR: NURSING AND PERSONAL CARE FACILITY." That notation is incorrect as it is not a nursing or personal care facility, but an apartment building.

39.      Defendant's inclusion of self-contradictory and duplicative address information in Plaintiff Gambles' report violates 15 U.S.C. § 1681e(b) in two ways. First, the inclusion of duplicative information creates an inaccurate and adverse presentation of Plaintiff Gambles to prospective employers. By showing that Plaintiff Gambles had lived at 53 separate addresses over a thirteen year period, instead of only 19 separate addresses, Defendant portrayed Plaintiff Gambles as substantially less geographically stable than he actually is. Second, the inclusion of inaccurate information regarding the dates when Plaintiff Gambles was "first" and "last" seen at given addresses violates § 1681e(b) because the information is patently inaccurate—there can only be one "first" and only one "last."

## ALLEGATIONS RELATING TO NAMED PLAINTIFF MERCK

40.      In May of 2016, Plaintiff Merck applied for work at Wal-Mart. The yearly salary for the position for which Plaintiff Merck applied was under $75,000.

41.      On or around May 27, 2016, Defendant furnished a background report on Plaintiff Merck to his prospective employer. A redacted copy of the report is attached hereto as Exhibit 3.

42.     Plaintiff Merck's report and the reports of other class members were not procured in connection with any investigation of suspected misconduct relating to employment, or compliance with federal, state, or local laws and regulations, the rules of a self-regulatory organization, or any suspected violation of preexisting written policies of the employer.

43.     Like Plaintiff Gambles' report, the report Defendant furnished to Plaintiff Merck's prospective employer purported to contain information regarding various places Plaintiff Merck had lived under the heading "Social Security Trace for County Searches."

44.     The "Social Security Trace for County Searches" section of Plaintiff Merck's report included no fewer than twenty-three separate entries, each of which purported to identify an address where Plaintiff Merck had lived.

45.     Each address entry contains a date which is identified as the "first seen" date and one which is identified as the "last seen" date.  These dates are meant to correspond with the period during which the consumer lived at the address.

46.     Many of these addresses included on Plaintiff Merck's report are duplicative of one another, and some of the time periods associated with different addresses overlap with one another.

47.     Despite the fact that Defendant's report contains twenty-three total address entries, it only contains fourteen unique addresses.  Moreover, the "first" and "last" seen dates for a number of these addresses contradict one another, meaning that some of the entries are, by definition, inaccurate.  *See, e.g.*, Ex. 3 at 2-4, listing various identical addresses, with entries for the same address containing different "first" and "last" seen dates.

48.     The earliest "first seen" address date included in Plaintiff Merck's report is November 1992.  The latest "last seen" date is May 2016.

49.     The oldest address included in Plaintiff Merck's report bears the warning "HIGH RISK INDICATOR."  The phrase "HIGH RISK INDICATOR" is then followed by a description purporting to describe the nature of the property located at the "high risk" address.  On Plaintiff Merck's report, the report indicates that the address was a "trailer park or campsite."

50.     In reality, the address which appears on Plaintiff Merck's report as a "HIGH RISK INDICATOR" is an address for a campground where Plaintiff Merck's step-father was a caretaker. Plaintiff Merck lived at that address when he was fourteen years old, approximately twenty-five years prior to the date on which the report was issued.

51.     Accordingly, Defendant's report on Plaintiff Merck unlawfully includes an item of information which is adverse to him, and which pertains to a period that antedates the report by more than seven years.  The inclusion of this information in Plaintiff Merck's report violates the plain language of 15 U.S.C. § 1681c.

52.     Defendant's report is also inaccurate on its face, as there cannot be multiple dates on which Plaintiff Merck was "first seen" or "last seen" at a given address.

53.     Defendant's report is also inaccurate with respect to the address history in a myriad of additional ways. For example, two of the addresses on the report (642 Wilson Avenue and 524 S. 7th Street) are addresses where Plaintiff Merck never lived. Each of these addresses appears twice.

54.     Defendant's inclusion of self-contradictory and duplicative address information in Plaintiff Merck's report violates 15 U.S.C. § 1681e(b) in at least two ways.  First, the inclusion of duplicative information creates an inaccurate and adverse presentation of Plaintiff Merck to prospective employers.  By showing that Plaintiff Merck had lived at twenty-three separate addresses over a period spanning over twenty-five years, instead of only twelve separate addresses,

Defendant portrayed Plaintiff Merck as substantially less geographically stable than he actually is. Second, the inclusion of inaccurate information regarding the dates when Plaintiff Merck was "first" and "last" seen at given addresses violates § 1681e(b) because the information is patently inaccurate—there can only be one "first" and only one "last."

## ALLEGATIONS RELATING TO NAMED PLAINTIFF COMPO

55.     In September of 2016, Plaintiff Compo applied for work at Wal-Mart.  The yearly salary for the position for which Plaintiff Compo applied was under $75,000.

56.     On or around September 9, 2016, Defendant furnished a background report on Plaintiff Compo to her prospective employer.  A redacted copy of the report is attached hereto as Exhibit 4.

57.     Plaintiff Compo's report and the reports of other class members were not procured in connection with any investigation of suspected misconduct relating to employment, or compliance with federal, state, or local laws and regulations, the rules of a self-regulatory organization, or any suspected violation of preexisting written policies of the employer.

58.     Like the other Plaintiffs' reports, the report Defendant furnished to Plaintiff Compo's prospective employer purported to contain information regarding various places Plaintiff Compo had lived under the heading "Social Security Trace for County Searches."

59.     The "Social Security Trace for County Searches" section of Plaintiff Compo's report included no fewer than 100 separate entries, each of which purported to identify an address where Plaintiff Compo had lived.  This section took up seven of the report's eleven pages.

60.     Each address entry contains a date which is identified as the "first seen" date and one which is identified as the "last seen" date.  These dates are meant to correspond with the period during which the consumer lived at the address.

61.     Many of these addresses included on Plaintiff Compo's report are duplicative of one another, and some of the time periods associated with different addresses overlap with one another.

62.     Despite the fact that Defendant's report contains 100 total address entries, it only contains twenty-four unique addresses.  Moreover, the "first" and "last" seen dates for a number of these addresses contradict one another, meaning that some of the entries are, by definition, inaccurate.

63.     Two of the addresses included in Plaintiff Compo's report bear the warning "HIGH RISK INDICATOR."   The phrase "high risk indicator" is then followed by a description purporting to describe the nature of the property located at the "high risk" address.  On Plaintiff Compo's report, the report indicates that one of the addresses was a "Hotel or Motel" and that one was a "Residential Care Facility."

64.     The address listed as a "Residential Care Facility" is not, in fact, a residential care facility.  Rather, it is the address of the Gathering Place, a non-residential, daytime, drop-in resource center for women, children, and transgendered people. It provides extensive services for all.

65.     The Gathering Place encourages victims of domestic violence to list its address on job applications and other materials, if they would prefer to keep their actual address confidential.

66.     By labeling Plaintiff Compo and others who have used the Gathering Place's resources as "high risk," Defendant has made it more difficult for victims of domestic violence to obtain employment.

## DEFENDANT'S CONDUCT DID CONCRETE HARM TO PLAINTIFFS

67.     The labeling of Plaintiffs Merck and Gambles as "HIGH RISK" based on information more than seven years old did concrete harm to Plaintiffs by making them appear less appealing to potential employers than they otherwise would have appeared.  Congress has made a policy determination that adverse information older than seven years, other than criminal convictions, should not be provided to potential employers by consumer reporting agencies.  15 U.S.C. § 1681c(a).  Numerous states have recognized that the reporting of old adverse information harms job applicants and imposed similar bans.  *See, e.g.*, N.Y. Gen. Bus. Law § 380-j; Tex. Bus. & Com. Code Ann. § 20.05; California Civil Code § 1786.18(a)(7); N.H. Rev. Stat. Ann. § 359-B:5.  By failing to provide Plaintiffs with the "fresh start" mandated by Congress, Defendant did concrete harm to them.  Similarly, with respect to Plaintiff Compo, Defendant's labeling her as "HIGH RISK" based on her decision to use a day shelter that provides services and resources on several issues affecting women, including domestic violence, as her mailing address was harmful, as it indicated she lived in a residential "facility" of some sort (which she did not) and also indicated she was "HIGH RISK" (which she was not).

68.     By reporting outdated and inaccurate adverse information which Congress has deemed unreportable, Defendant invaded Plaintiffs' privacy.  This invasion of privacy was a concrete harm.  In passing 15 U.S.C. § 1681c, Congress recognized a privacy right that is attached to old information, even information that exists in public records.  The connection between forbidding the reporting of old information and consumers' privacy rights is well-established.  *See King v. General Information Services Inc.*, 2:10-cv-06850, ECF No. 52 at 14 (E.D. Pa.) (Brief of the United States, arguing that "Section 1681c's restrictions on disclosing older adverse information serve the governmental interest in protecting individuals' privacy.")

15

69.     Falsely labeling Plaintiff Gambles, Merck and Compo as "HIGH RISK" did concrete harm to their job prospects.  Not only was the adverse information Defendant reported outdated, it was also derogatory and false.  Specifically, Defendant falsely reported that Plaintiff Gambles had, at various times, lived in a hotel or motel, a rooming or boarding house, and a nursing and personal care facility and that he was "high risk" as a result.  Defendant falsely reported that Merck had lived in a campground and was "high risk" as a result of that, despite the fact that he lived there when he was fifteen years old.  Defendant falsely reported that Compo's address was for a residential facility, and that she was "high risk" as a result; neither is true.

70.     Defendant has no empirical basis for identifying the addresses it identified as "high risk."

71.     Nonetheless, Defendant provided this information to Plaintiffs' potential employers for the sole purpose of allowing Plaintiffs' potential employers to evaluate them for employment.  Reporting false and damaging information to one's potential employer is a concrete harm in and of itself and would have been actionable at common law as defamation *per se*.

72.     In addition to the inaccurate and derogatory labeling of Plaintiffs as "HIGH RISK," the inaccurate and duplicative manner in which all Plaintiffs' address histories were reported created concrete harm, because it made them look less appealing to their potential employers.  By creating the misimpression that Plaintiffs are itinerant and geographically unstable, Defendant committed a concrete harm strongly analogous to common-law defamation.

73.     Defendant is one of the largest employment screening companies in the United States.  There is a substantial risk to Plaintiffs that Defendant will report this false and derogatory information to another potential employer.

74.     Plaintiffs were distressed and suffered emotional harm due to the false and derogatory information contained in their reports.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

**A.     Defendant's Illegal Reporting of Outdated Adverse Information.**

75.     When a consumer reporting agency furnishes a consumer report, the agency is required to exclude adverse items of information which antedate the consumer report by more than seven years.  15 U.S.C. § 1681c(a)(5).

76.     Defendant's practice of including "high risk" warning indicators based on addresses where, according to Defendant, the consumer was "last seen" more than seven years ago violates a fundamental protection afforded to consumers under the FCRA, is contrary to the unambiguous language of the statute, and is counter to longstanding judicial and regulatory guidance.  *See, e.g.,* FTC, *Forty Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report with Summary of Interpretations*, July 2011, at 55 ("Even if no specific adverse item is reported, a CRA may not furnish a consumer report referencing the existence of adverse information that predates the times set forth in this subsection."); *Serrano v. Sterling Infosystems, Inc.*, 557 F. Supp. 2d 688 (C.D. Cal. 2008) (holding that the FCRA prohibits even *alluding* to existence of unreportable adverse information).

77.     Defendant's consumer reports are produced in an automated fashion from electronic databases.

78.     As part of the process of assembling consumer reports, these databases utilize a variety of algorithms to ensure that information reported "matches" the consumer who is the subject of the report.  *See* Exhibit 5, http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf, at 22.

79.     In the same way that Defendant uses algorithms to ensure that personally identifying information in a report matches the subject of the report's information, it is standard practice for consumer reporting agencies to write algorithms "to filter out obsolete credit information."  *See* Exhibit 6, www.naca.net/issues/credit-reporting-problems.

80.     As one of the largest consumer reporting agencies, and one which invests heavily in technology, Defendant is aware of the power of algorithms, and their usefulness in structuring consumer reports.

81.     Given its awareness and technical prowess, Defendant, consistent with standard industry practices, could have easily written an algorithm to ensure that all of its reports would exclude "high risk" warning labels associated with addresses where the "first seen" and "last seen" dates both predate the report by more than seven years.

82.     It is standard in the consumer reporting industry for consumer reporting agencies to have a purge date for information in their system that has become outdated.  *See Gillespie v. Trans Union Corp.*, 482 F.3d 907, 908 (7th Cir. 2007).  Yet, Defendant failed to implement a purge date in its systems.

83.     In addition to failing to implement automated procedures to avoid statutory violations, Defendant also failed to have its reports properly reviewed by an individual who was trained in the FCRA, and specifically, in the requirements of 15 U.S.C. § 1681c.  Had Defendant had a properly trained individual review its reports, these problems would have been easily detected.

84.     By failing to utilize appropriate algorithms, purge dates, or manual review, Defendant's practices and procedures for excluding adverse information older than seven years

fell far below industry standards and constitute knowing and reckless disregard for Defendant's statutory obligations.

**B.     Defendant's Illegal Failure to Adopt Reasonable Procedures to Ensure Maximum Possible Accuracy.**

85.     Consumer reporting agencies are required to adopt reasonable procedures to ensure maximum possible accuracy of the information included in the reports they issue.  15 U.S.C. § 1681e(b).

86.     The obligations of 15 U.S.C. § 1681e(b) require both that the information presented in consumer reports be actually accurate, and also that the information be presented in such a way as to not be misleading.

87.     The address history information in Defendant's reports is inaccurate in two ways.  First, it is inaccurate on its face.  Second, it is presented in a misleading fashion.

88.     Defendant's reports are inaccurate on their face because they contain multiple inconsistent "first seen" and "last seen" dates for the same address. This internally inconsistent information is obviously not accurate.  There can only be one "first" and only one "last."  Yet, Defendant's report provides multiple "first" and "last" dates for the same address.

89.     Defendant could have easily written an algorithm that would identify circumstances in which its reports were self-contradictory as to the "first" and "last" seen dates, so that Defendant could take appropriate steps to identify the correct dates.  However, Defendant failed to do so.

90.     Alternatively, or additionally, Defendant could have hired individuals to manually review its reports before Defendant issued those reports to ensure that they did not include self-contradictory information.  Yet, Defendant failed to do so.

91.     Defendant's decision to include numerous entries regarding the same address also causes Defendant's reports to be inaccurate.

92.     Reports that contain factually correct information but nonetheless mislead their readers are neither maximally accurate nor fair to the consumers who are the subjects of such reports.  Reporting the same item of information multiple times is misleading.  *See Smith v. HireRight Solutions, Inc.*, 711 F. Supp. 2d 426 (E.D. Pa. 2010).

93.     Consumer reporting agencies' obligation to ensure maximum possible accuracy includes an obligation to exclude multiple entries for the same item of information.  In the context of reporting criminal offenses, the *Smith* court noted that duplicative reporting "creates an adverse presentation."  *Id.* at 436.

94.     The Federal Trade Commission ("FTC") has sued at least one consumer reporting agency for reporting criminal incidents more than once in a report, and other consumer reporting agencies already make efforts to identify and delete duplicative entries.  *See, e.g., U.S. v. HireRight Solutions, Inc.*, No. 12-cv-1313, Stipulated Final Judgment, ECF No. 3 at 4 (D.D.C. Aug. 29, 2012) (stating that HireRight is enjoined from "failing to follow reasonable procedures to prevent the inclusion of multiple entries for the same criminal offense in a single report").

95.     Defendant is a member of the National Association of Professional Background Screeners ("NAPBS").  NAPBS has informed its members of the FTC's case against HireRight and the dangers of duplicative reporting of criminal information.

96.     Defendant could have easily written an algorithm which would identify instances where the same address was being reported more than once in a given report.  Yet, Defendant failed to do so.  Similarly, Defendant could have implemented manual review of its reports to ensure each address was only reported once.  Yet, Defendant failed to do so.

97.     Despite Plaintiffs' written requests for Defendant to identify the sources of the information in its reports, Defendant did not identify any third-party source of the address information which is the subject of this lawsuit.

98.     Discovery will show that Defendant purchased the address history data from a third party, that Defendant did not engage in any quality control before parroting the information it received from that third party, and that Defendant has no independent empirical or other basis on which to claim that the addresses it identified as being certain kinds of locations (rooming house, boarding house, etc.) are in fact those kinds of locations.  Discovery will further show that Defendant possesses no independent or empirical basis for labeling people whose address reports show an association with one of those kinds of addresses as "HIGH RISK."

99.     By failing to adopt any quality control procedures whatsoever to ensure that the dates in its reports were accurate, and by failing to eliminate duplicative entries, and by failing to insist on an empirical basis for its designation of certain addresses as "high risk," Defendant violated the FCRA's core statutory mandate of maximum possible accuracy.

100.     Defendant knew that its address history information was inaccurate and unreliable. Indeed, Defendant attempted to disclaim the contents of the "Social Security Trace" by including a disclaimer in its reports warning the user away from relying on the data.  Specifically, Defendant includes the following:

> END-USER IS NOTIFIED THAT FOR LEGAL AND PRACTICAL REASONS INFORMATION OBTAINED THROUGH A SOCIAL SECURITY NUMBER TRACE SHOULD BE USED ONLY TO VERIFY THE INFORMATION PROVIDED BY THE CONSUMER ON HIS/HER EMPLOYMENT APPLICATION. INFORMATION OBTAINED THROUGH A SOCIAL SECURITY NUMBER TRACE SHOULD NOT BE USED ALONE OR IN CONJUNCTION WITH ANY OTHER INFORMATION TO MAKE AN EMPLOYMENT DECISION.

101.    Consumer reporting agencies cannot absolve themselves of the legal responsibility to maintain reasonable procedures to ensure maximum possible accuracy by including disclaimers in their reports purporting to warn users that the information included therein is unreliable.

102.    Defendant knew its customers would rely on the address information for employment purposes, and fully intended for them to do so.  Defendant's customers certified to Defendant, consistent with 15 U.S.C. § 1681b(b)(1), that they were using the reports for employment purposes.  Defendant intentionally provided "high risk" labels in the Social Security Trace section of its reports so that its customers would, and could, rely on that data in making employment decisions.

103.    If, as Defendant's disclaimer claims, the address information was to be used for address verification purposes only, then there would be no need for Defendant to identify certain addresses as "high risk."

104.    Moreover, Defendant's disclaimer explicitly advises its customers to use the unreliable "first" and "last" address information to "verify" other information provided to the customer by the consumer during the job application process.

105.    Defendant's disclaimer demonstrates that its violations were knowing, or at the very least, reckless.

**C.    Defendant's Legal Violations Harmed Consumers.**

106.    Employers increasingly rely on reports compiled by consumer reporting agencies in making hiring decisions.  *See* FTC, Data Brokers: A Call for Transparency and Accountability (2014), *available at*  https://www.ftc.gov/system/files/documents/reports/  data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527 databrokerreport.pdf (discussing the dramatic expansion and availability of consumer data

22

collection by consumer reporting companies and how the consumer reports they compile are increasingly detailed and voluminous, yet frequently prone to inaccuracy); Brief for Massachusetts, et al. as Amici Curiae Supporting Respondent, *Spokeo, Inc. v. Robins*, No. 13-1339, 2015 WL 5316995 (U.S. Sept. 8, 2015) ("While the commercial use of consumer data profiles is not new, emerging technologies and the digitization of data have dramatically expanded the volume and commercial availability of ever-more detailed data.").[1]

107.    Given employers' reliance on reports prepared by consumer reporting agencies, it follows that labelling a candidate as "high risk" is likely to be taken at face value by employers and hurt that individual's job prospects.  By presenting information about consumers in a way that made them appear to have moved around more than they actually had, and by labeling them as "high risk" based on the addresses where they had lived, Defendant's conduct made consumers less attractive to prospective employers than they otherwise would have been.

108.    By purporting to offer "unrivaled accuracy," Defendant encouraged employers to rely on facially inaccurate dates in its reports concerning consumers' representations about where they had lived and when.  *See* http://www.sterlingtalentsolutions.com/about/about-us/ (last visited April 4, 2017).

**D.    Defendant's Legal Violations Are Knowing, Willful, and Driven by Self-Interest.**

109.    Defendant includes the section titled "Social Security Trace for County Searches" in its reports in order to identify all the places where the subject of the report may have lived, and

---

[1] *See also* Persis S. Yu and Sharon M. Dietrich, Broken Records: How Errors By Criminal Background Checking Companies Harm Workers and Businesses, Nat'l Consumer Law Center, 31 (Apr. 2012), http://www.nclc.org/images/pdf/pr-reports/broken-records-report.pdf ("Employers seldom read the disclaimers [aimed at circumventing FCRA obligations] and believe that the report they have bought is accurate and stands on its own.").

to therefore identify jurisdictions where public records should be searched for information about the subject of the report.

110.    Defendant has a business interest in including as many addresses as possible so that it can encourage its clients to purchase criminal record searches from as many jurisdictions as possible.

111.    Defendant also includes this "Social Security Trace for County Searches" in its reports to make the reports appear voluminous, and to create the impression for its customers that the customers have purchased something of value.

## CLASS ACTION ALLEGATIONS

112.    Plaintiffs assert their claims against Defendant on behalf of themselves and the Classes defined as follows:

**Outdated Adverse Information Class**

    i.   All individuals on whom Defendant prepared a background report from December 14, 2013 and continuing through the date the class list is prepared;

    ii.   Whose background report contains a social security trace which includes at least one address where both the "first" and "last" seen dates antedate the report by more than seven years; and

    iii.   Where at least one of the addresses in (ii) includes a "high risk" indicator.

**Duplicative Information Class**

    i.   All individuals on whom Defendant prepared a background report from December 14, 2013 and continuing through the date the class list is prepared;

    ii.   Whose background report contains a social security trace which includes the same address repeated more than once.

**Duplicative Information Colorado Sub-Class**

    i.   All members of the Duplicative Information Class who reside in Colorado.

**Inaccurate Address Information**

      i.    All individuals on whom Defendant prepared a background report from December 14, 2013 and continuing through the date the class list is prepared;

     ii.    Whose background report contains a social security trace which includes the same address repeated more than once; and

   iii.    Where the "first" or "last" seen dates for the duplicative entries for the same address are not identical to one another.

**Inaccurate Address Colorado Sub-Class**

      i.    All members of the Inaccurate Address Class who reside in Colorado.

113.    Numerosity.  The Classes are so numerous that joinder of all class members is impracticable.  Defendant has produced thousands of reports covered by the claims in this case.

114.    Typicality.  Plaintiffs' claims are typical of the members of the Classes. Throughout the class period, Defendant typically produced reports including outdated, duplicative, and inaccurate address information.  The FCRA violations suffered by Plaintiffs are typical of those suffered by other class members, and Defendant treated Plaintiffs consistent with other class members in accordance with its standard policies and practices.

115.    Adequacy.  Plaintiffs will fairly and adequately protect the interests of the Classes, and have retained counsel experienced in complex class action litigation.

116.    Commonality.  Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes, including but not limited to:

a.    Whether Defendant includes outdated, duplicative, and inaccurate address information in its reports;

b.    Whether Defendant's violations of the FCRA are willful;

c.    The proper measure of statutory damages and punitive damages; and

       d.      The proper form of injunctive and declaratory relief.

117.    This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the Classes would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendant. Further, adjudication of each individual class member's claim as a separate action would potentially be dispositive of the interest of other individuals not a party to such action, impeding their ability to protect their interests.

118.    This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

119.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA. Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendant by any members of the Classes on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

120.     Plaintiffs intend to send notice to all members of the Classes to the extent required by Rule 23.  The names and addresses of the class members are available from Defendant's records.

**CLAIM I**
**Reporting Outdated Adverse Information**
**15 U.S.C. § 1681c(a)**
*Asserted by Plaintiffs Gambles and Merck on behalf of the Outdated Information Class*

121.     Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1-120.

122.     In return for money, Defendant furnished consumer reports on Plaintiffs Gambles and Merck and other members of the Outdated Information Class to third parties.

123.     The consumer reports provided by Defendant included addresses antedating the reports by more than seven years and which resulted in consumers being labeled as "high risk."

124.     The foregoing violations were willful.  Defendant acted in deliberate or reckless disregard of its obligations and the rights of Plaintiffs and the Outdated Information Class members under 15 U.S.C. § 1681c(a).  Defendant's willful conduct is reflected by, *inter alia*, the following:

   a)     Defendant was founded in 1975, and the FCRA was enacted in 1970. Defendant has had over 40 years to become compliant;

   b)     Defendant is a large corporation which specializes in furnishing consumer reports for employment purposes and has access to legal advice through its own general counsel's office and outside counsel.  Yet, there is no contemporaneous evidence that Defendant determined that its conduct was lawful;

   c)     Defendant was previously sued for similar conduct, paid monetary damages, and promised to no longer report old adverse information, yet persisted in doing so;

   d)     Defendant could have easily established and used a computer-based algorithm to

filter the database from which it produces consumer reports to ensure that addresses with "first" and "last" seen dates older than seven years were excluded from reports, or that consumers were not labeled as "high risk" based on those addresses;

e)      Defendant's conduct is inconsistent with the plain language of the statute; and

f)      Despite the pellucid statutory text and there being a depth of guidance, Defendant adopted a policy of systematically reporting old "high risk" information based on addresses that antedated the report by more than seven years.  By adopting such a policy, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

125.    Plaintiffs and the Outdated Information Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations pursuant to 15 U.S.C. § 1681n(a)(1)(A).

126.    Plaintiffs and the Outdated Information Class are entitled to such amount of punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2).

127.    Plaintiffs and the Outdated Information Class are further entitled to recover their costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3).

### CLAIM II
**Duplicative Reporting**
**15 U.S.C. § 1681e(b)**
***Asserted by All Plaintiffs on behalf of the Duplicative Information Class***

128.    Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1-127.

129.    In return for money, Defendant furnished consumer reports on Plaintiffs and other members of the Duplicative Information Class to third parties.

130.    The consumer reports provided by Defendant included multiple entries for the same addresses.

28

131.    This resulted in consumers appearing to have lived at more locations than they actually had, and made them appear less geographically stable than they actually were.

132.    The inclusion of misleading and duplicative information on consumer reports violates the plain text of the FCRA, as well as FTC guidance.

133.    The foregoing violations were willful.  Defendant acted in deliberate or reckless disregard of its obligations and the rights of Plaintiffs and the Duplicative Information Class members under 15 U.S.C. § 1681c(a).  Defendant's willful conduct is reflected by, *inter alia*, the following:

a)    Defendant was founded in 1975, and the FCRA was enacted in 1970; Defendant has had over 40 years to become compliant;

b)    Defendant is a large corporation which specializes in furnishing consumer reports for employment purposes and has access to legal advice through its own general counsel's office and outside counsel.  Yet, there is no contemporaneous evidence that Defendant determined that its conduct was lawful;

c)    Defendant could have easily established and used a computer-based algorithm to filter the database from which it produces consumer reports to ensure that each address was only listed once;

d)    Defendant's conduct is inconsistent with the plain language of the statute;

e)    Despite the pellucid statutory text and there being a depth of guidance, Defendant adopted a policy of systematically including multiple address entries to create the misimpression that its reports were comprehensive, and to encourage its customers to purchase criminal records information from multiple jurisdictions;

f)    By adopting such a policy, Defendant voluntarily ran a risk of violating the law

29

substantially greater than the risk associated with a reading that was merely careless; and

g)      Defendant attempted to disclaim responsibility for the inaccurate presentation of information in its reports by telling its customers not to rely on the reports, even though the sole purpose for which it sold the reports was to allow its customers to evaluate prospective employees, and even though the section it told its customers not to rely on labeled consumers as "high risk."

134.    Plaintiffs and the Duplicative Information Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations pursuant to 15 U.S.C. § 1681n(a)(1)(A).

135.    Plaintiffs and the Duplicative Information Class are entitled to such amount of punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2).

136.    Plaintiffs and the Duplicative Information Class are further entitled to recover their costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3).

<u>**CLAIM III**</u>
**Duplicative Reporting**
**Colo. Rev. Stat. § 12-14.3-103.5.**
*Asserted by Plaintiff Compo on behalf of the Colorado Duplicative Information Sub-Class*

137.    Plaintiff Compo realleges and incorporates the allegations set forth in Paragraphs 1-136.

138.    For all the reasons Defendant's duplicative reporting willfully violated the FCRA, it also willfully violated the CCRA.

139.    Plaintiff Compo and the Colorado Duplicative Information Sub-Class are entitled to statutory damages, costs and attorneys' fees pursuant to Colo. Rev. Stat. § 12-14.3-108.

<u>**CLAIM IV**</u>
**Reporting Inaccurate Information**
**15 U.S.C. § 1681e(b)**
*Asserted by All Plaintiffs on behalf of the Inaccurate Address Information Class*

140.    Plaintiffs reallege and incorporate the allegations set forth in Paragraphs 1-139.

141.    In return for money, Defendant furnished consumer reports on Plaintiffs and other members of the Inaccurate Address Information Class to third parties.

142.    The consumer reports provided by Defendant included multiple entries for the same addresses.  The reports also included "first" and "last" seen dates for those addresses which were internally inconsistent, and therefore, by definition inaccurate.

143.    The inclusion of plainly inaccurate information on consumer reports violates the plain text of the FCRA.

144.    The foregoing violations were willful.  Defendant acted in deliberate or reckless disregard of its obligations and the rights of Plaintiffs and the Inaccurate Address Information Class members under 15 U.S.C. § 1681c(a).  Defendant's willful conduct is reflected by, *inter alia*, the following:

a)    Defendant was founded in 1975, and the FCRA was enacted in 1970; Defendant has had over 40 years to become compliant;

b)    Defendant is a large corporation which specializes in furnishing consumer reports for employment purposes and has access to legal advice through its own general counsel's office and outside counsel.  Yet, there is no contemporaneous evidence that Defendant determined that its conduct was lawful;

c)    Defendant could have easily established and used a computer-based algorithm to filter the database from which it produces consumer reports to ensure that each address was only listed once and to ensure that its reports did not include internally

inconsistent "first" and "last" seen dates;

d)      Defendant's conduct is inconsistent with the plain language of the statute;

e)      Despite the pellucid statutory text and there being a depth of guidance, Defendant adopted a policy of systematically including multiple address entries with inaccurate date information, to create the misimpression that its reports were comprehensive, and to encourage its customers to purchase criminal records information from multiple jurisdictions over multiple time periods;

f)      By adopting such a policy, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless; and

g)      Defendant attempted to disclaim responsibility for the inaccurate presentation of information in its reports by telling its customers not to rely on the reports, even though the sole purpose for which it sold the reports was to allow its customers to evaluate prospective employees, and even though the section it told its customers not to rely on labeled consumers as "high risk."

145.    Plaintiffs and the Inaccurate Address Information Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations pursuant to 15 U.S.C. § 1681n(a)(1)(A).

146.    Plaintiffs and the Inaccurate Address Information Class are entitled to such amount of punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2).

147.    Plaintiffs and the Inaccurate Address Information Class are further entitled to recover their costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3).

**CLAIM V**
**Reporting Inaccurate Information**
**Colo. Rev. Stat. § 12-14.3-103.5.**
*Asserted by Plaintiff Compo on behalf of the*
*Colorado Inaccurate Address Information Sub-Class*

148.    Plaintiff Compo realleges and incorporates the allegations set forth in Paragraphs

1-147.

149.    For all the reasons Defendant's inaccurate reporting willfully violated the FCRA,

it also willfully violated the CCRA.

150.    Plaintiff Compo and the Colorado Inaccurate Address Information Sub-Class are

entitled to statutory damages, costs and attorneys' fees pursuant to Colo. Rev. Stat. § 12-14.3-108.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray for relief as

follows:

a)    Determining that this action may proceed as a class action;

b)    Designating Plaintiffs as representatives for the Classes and designating Plaintiffs'

Counsel as counsel for the Classes;

c)    Issuing proper notice to the Classes at Defendant's expense;

d)    Declaring that Defendant committed multiple, separate violations of the FCRA and

CCRA;

e)    Declaring that Defendant acted willfully, in deliberate or reckless disregard of

Plaintiffs' rights and Defendant's obligations under the FCRA and CCRA;

f)    Awarding statutory and punitive damages as provided by the FCRA and CCRA;

g)   Awarding reasonable attorneys' fees and costs as provided by the FCRA and

CCRA; and

h)   Granting further relief, in law or equity, as this Court may deem appropriate and

just as provided by the FCRA and CCRA.

### DEMAND FOR JURY TRIAL

151.   Plaintiffs and the Classes demand a trial by jury.

Dated: April 12, 2017                BERGER & MONTAGUE, P.C.

                                     /s/ *E. Michelle Drake*
                                     Joseph C. Hashmall, MN Bar No. 392610*
                                     E. Michelle Drake, MN Bar No. 387366*
                                     43 SE Main Street, Suite 505
                                     Minneapolis, MN 55414
                                     Telephone: (612) 594-5999
                                     Fax: (215) 875-3000
                                     jhashmall@bm.net
                                     emdrake@bm.net

                                     TOWARDS JUSTICE
                                     David Seligman, CO Bar No. 49394**
                                     1535 High Street, Suite 300
                                     Denver, CO 80218
                                     Tel: (720) 248-8426
                                     Fax: (303) 957-2289
                                     david@towardsjustice.org

                                     TERRELL MARSHALL LAW GROUP PLLC
                                     Beth Terrell, WA Bar No. 26759**
                                     936 N. 34th Street, Suite 300
                                     Seattle, Washington 98103
                                     Tel: 206.816.6603
                                     Fax: 206.319.5450
                                     bterrell@terrellmarshall.com

                                     OMDP ATTORNEYS & COUNSELORS
                                     Matthew A. Dooley, OH Bar No. 0081482**
                                     5455 Detroit Rd, (Route 254)
                                     Sheffield Village, OH 44054
                                     Telephone: 440-930-4001

34

Facsimile: 440-934-7205
mdooley@omdplaw.com

NICHOLS KASTER, PLLP
Michele R. Fisher, NY Bar No. MF4600
4600 IDS Center,
80 South Eighth Street
Minneapolis, MN 55402
Tel. (612) 256-3200
Fax: (612) 215-6870

\* admitted *pro hac vice*
\*\**pro hac vice* forthcoming

ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE CLASSES

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2017, I caused the foregoing document to be electronically

filed with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to all counsel of record.

*/s/ E. Michelle Drake*
E. Michelle Drake